## Staten et al. v. Louisville Trust Co.

Jan. 23, 1942.

Branko M. Steiner and Wilbur O. Fields for appellants.

Squire Ogden and Ogden, Galphin, Tarrant & Street for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

This appeal is prosecuted from a judgment in favor of the Louisville Trust Company entered on its counter-claim and cross-petition against the appellants, Ida M. Staten and Wm. B. Fahey, enforcing the payment of the

balance due on notes executed by appellants and held by the Trust Company. The judgment against Mrs. Staten was for $10,387.35 and against Fahey for $6,245.75. The facts giving rise to the litigation are substantially as follows.

On November 6, 1931, Fahey was indebted to the Trust Company in the sum of $45,347.79. The Trust Company held 756 shares of stock of the Kentucky Central Life and Accident Insurance Company as collateral. The market value of the stock was less than the amount of the debt and the Trust Company was unwilling to carry the loan any further without additional security or substantial payment thereon.

Fahey's sister, Mrs. Staten, executed her note to the Trust Company for $15,000, dated November 6, 1931, secured by the pledge of a note of one Kulvin in the amount of $15,000, which latter note was secured by lien on a negro apartment house in Chicago. Fahey also signed the Staten note. The Trust Company deposited the proceeds of the $15,000 Staten note to the account of Mrs. Staten. Fahey gave Mrs. Staten his note for $15,000 and Mrs. Staten gave her check to Fahey for $15,000, which Fahey indorsed and delivered to the Trust Company. The Trust Company accepted from Fahey his renewal note in the sum of $30,347.79.

Between November 6, 1931, and September, 1934, Fahey made payments on his separate notes sufficient to discharge the interest and to reduce the principal by more than $3,000. This note, subject to credits, was renewed from time to time. No payments were made by Fahey or Mrs. Staten on Mrs. Staten's $15,000 note but it was renewed a number of times. The only payment ever made on the Staten note was $1,000 paid August 6, 1938, under a federal court order requiring such payment as a condition to granting a temporary injunction (this federal court action was later dismissed upon the ground that the court did not have jurisdiction).

The Kulvin note, pledged to secure Mrs. Staten's note, matured and was not paid and at Mrs. Staten's request the Trust Company employed a Chicago attorney to foreclose the lien of the mortgage on the Chicago property. That action was prosecuted to a conclusion and prior to September, 1934, according to practice in the Illinois courts, there was issued to the Trust Company

a Master's Certificate showing the purchase of the property by the Trust Company at the foreclosure sale. The Master's Certificate is a document issued to the purchaser and held by him during the time allowed by Illinois law to the defendant at the foreclosure proceeding within which to redeem the property. The Trust Company paid $1,023.50 in connection with the foreclosure proceeding and the amount was added to one of the renewals of the note of Mrs. Staten, which note was also signed by Fahey. The Master's Certificate was held by the Trust Company as collateral on the note in lieu of the Kulvin note. Under the terms of the notes held by the Trust Company it was given authority to sell collateral upon default on the part of the maker.

At the time of the receipt of the Master's Certificate, February, 1934, the Staten note was in default but was again renewed. It became in default again and in May, 1934, the Trust Company gave Mrs. Staten notice and sold the collateral (the Master's Certificate), the Trust Company becoming the purchaser at the sale. Mrs. Staten was advised of the sale and the Trust Company offered to accept a renewal of her note conditioned on the payment of approximately $500 in cash.

Matters stood thus until the early part of February, 1934, when Fahey and Mrs. Staten employed Arthur B. Bensinger, an attorney, to represent them in an effort to obtain a reduction of their indebtedness to the Trust Company.

It appears from correspondence in the record that in the attempt to obtain a reduction of the indebtedness Mr. Bensinger urged two claims 1) that $12,500 of the total debt was borrowed from the Trust Company for the purpose of purchasing BancoKy. stock and that the circumstances were such that the Trust Company remit that portion of the indebtedness, 2) that Mrs. Staten, a married woman, was surety and therefore not personally liable on her note. These claims were disputed by the Trust Company but a settlement was finally reached on or about September 20, 1934, and a written agreement executed between the parties. As of September 4, 1934, the Trust Company held:

Note of Fahey dated July 30, 1934, on which
    there was due........................ $27,137.80
Note of Mrs. Staten and Fahey dated January

5, 1934, on which there were due as of
May 5, 1934 . . . . . . . . . . . . . . . . . . . . . . . . .    18,517.16

Thus the total of Fahey's indebtedness was
actually in excess of . . . . . . . . . . . . . . . . . .    $45.654.96

In accordance with the agreement of settlement Mrs. Staten executed a note dated September 12, 1934, in the sum of $15,000; Fahey executed a note of the same date for $14,074.51. Mrs. Staten expressly surrendered any defenses based on the theory that she was a surety. The Trust Company surrendered and cancelled the notes it held aggregating $45,654.96 and received in lieu thereof notes aggregating $29,074.51, making a reduction in the total debt of $16,580.45. From the correspondence appearing in the record and from the testimony of Ira J. Porter, who represented the Trust Company in the handling of the notes, it appears that the argument between Mr. Bensinger, representing appellants, and the Trust Company was largely concerned with the amount of the reduction for the BancoKy. stock. Mr. Bensinger was insisting that the $12,500 paid therefor should be deducted with interest compounded quarterly, which seems to have been the method by which interest was charged to Fahey. Under the settlement agreement as perfected, however, the interest reduction appears to have been $3,870.33 (although a further interest reduction of $210.12 was made, which is not perfectly clear from the record). The interest reduction of $3,870.33 was more than simple interest but less than interest compounded quarterly. In any event the total interest reduction was $4,080.45, making the total reduction from the face of the notes $16,580.45, as heretofore stated. This interest reduction was somewhat less than that insisted on by Mr. Bensinger in the correspondence.

After the making of the agreement of September, 1934, Fahey made payments on his indebtedness and gave renewal notes but nothing was paid by Mrs. Staten except the payment made pursuant to the federal court order heretofore mentioned.

Mrs. Staten's new $15,000 note dated September 12, 1934, matured May 1, 1935, and nothing was paid thereon. After notice to Mrs. Staten the Trust Company sold the Master's Certificate, held as collateral under the settlement agreement and became the purchaser for $5,000. About June 1, 1935, Kulvin's right of redemption expired

and a deed to the Chicago real estate was made to the Trust Company in the foreclosure action brought against Kulvin.

After the Trust Company received a deed to the Chicago property numerous offers were made to Mrs. Staten to renew her note and she was given every opportunity to effect an advantageous sale of the property although legal title had become vested in the Trust Company. The Trust Company in the meantime had engaged a responsible real estate firm in Chicago to manage the property. In November, 1937, after numerous attempts to sell the property, a purchaser was finally found at the price of $10,500 and deed was made to this purchaser. Mrs. Staten was credited on her note with the net proceeds of the sale of the real estate, leaving a balance of $10,387.35 due by her, which was the amount for which judgment was rendered.

The present action was filed by Mrs. Staten seeking an injunction to restrain the Trust Company from disposing of the 756 shares of the capital stock of the Kentucky Central, heretofore referred to, and in this action Fahey was made a defendant but both he and Mrs. Staten sought the same relief. The Trust Company, by counterclaim, sought, and was granted judgment on its notes.

The questions raised before the chancellor and now insisted on in this court are said by the appellants to be the following:

1) Was Mrs. Staten merely a surety for Fahey when she executed her original $15,000 note to the Trust Company?

2) Did the compromise settlement of September, 1934, deprive her of the right to claim that she was surety on the $15,000 note then executed if she was a surety as to the original note?

3) Was Mrs. Staten a surety as a matter of law when she signed the new note for $15,000 in accordance with the compromise settlement of September 12, 1934?

4) Did the Trust Company, under a mistake of fact, fail to give proper credit to Fahey in allowing him the deduction of $12,500 (borrowed for the purpose of purchasing Banco stock) and interest on that sum?

5) Was it the intention of the parties in crediting Fahey's account with $12,500, representing that portion

of the loan used for Banco stock, also to credit his account with interest compounded quarterly on that sum from the date of the loan to the date of the compromise settlement?

6) Did the Trust Company, upon crediting Mrs. Staten's note with $3,517.16 (which was the interest due on the original note up to September 12, 1934), erroneously and under a mistake of fact add that amount to the indebtedness of Fahey at the time of the settlement agreement and fix his indebtedness at $14,074.51?

7) Did the Trust Company acquire a fee simple title to the Chicago property?

8) Did the Trust Company have only an equitable mortgage in the Chicago property which was insufficient to give it power, under the Illinois law, to sell that property without first having foreclosed the equitable mortgage in order to vest itself with a fee simple title?

9) What was the fair market value of the Chicago property at the time the Trust Company disposed of it and how much credit should Mrs. Staten be entitled to receive against her indebtedness?

10) Did the Trust Company charge Fahey with usurious interest by reason of the fact (claimed by appellants to be true but denied by the Trust Company) that at the time of the execution of each renewal note interest was added in advance to the principal from the date of the note till its maturity and no rebate allowed Fahey for payments of such interest?

We may add that the chancellor found as a fact that no mistake was made with reference to the computation of the amount due by Fahey in the execution of the compromise settlement and also that the amount for which the Chicago real estate was sold, $10,500, was the fair and reasonable market value of the property.

The first three questions posed for decision by appellants may be grouped together and disposed of summarily by saying that the nature of the judgment appealed from renders those questions academic and removes the necessity to decide them. Section 2127 of the Kentucky Statutes prohibits the estate of a married woman from being subjected for any liability as surety unless her estate is "set apart for that purpose by deed

of mortgage or other conveyance." A pledge of collateral is held to be a conveyance within the meaning of the statute so that collateral pledged by a married woman to secure a suretyship obligation may be subjected to the payment of that obligation. Wirgman v. Miller, 98 Ky. 620, 33 S. W. 937. The Trust Company therefore had the right to apply the proceeds of the sale of the Chicago real estate to the discharge of the Staten note pro tanto.

The 756 shares of stock pledged by Fahey to the Trust Company were held also by it as collateral for the payment of Mrs. Staten's note. The judgment appealed from contains the express provision, "that the proceeds from the sale of the shares of stock shall be applied *first* to the payment and discharge of the judgment rendered herein against Ida M. Staten." The judgment was not superseded and the stock was sold for $16,914.23, which was the aggregate liability, including costs, of both Mrs. Staten and Fahey under the judgment. It is therefore apparent that it is not necessary to subject Mrs. Staten's separate estate, over and above the pledged collateral, to the payment of the judgment. This being true it is immaterial whether or not Mrs. Staten was liable only as surety on the $15,000 note executed pursuant to the compromise agreement.

Questions four and five both deal with the contention that a mistake was made as to the amount of credit to be allowed Fahey under the compromise settlement. It is contended by appellants that it was the intention of the parties to credit Fahey with $12,500, borrowed for the purpose of purchasing BancoKy. stock, with interest compounded quarterly on that sum from the date of the loan to the date of the compromise settlement. The chancellor found that the evidence failed to establish that a mistake was made and we have no doubt as to the correctness of that finding. Appellants' theory that a mistake was made in the computation of interest is based solely on the fact that negotiations took place between the parties looking to a settlement on the basis claimed by them. However, the interest deduction as finally allowed, and as shown by the compromise settlement, was somewhat more than simple interest and less than compound interest and there is no evidence on which to base a finding that a mistake was made. The evidence fails to show what took place between the parties when the actual agreement of settlement was executed and is whol-

ly insufficient to justify the finding that there was a mistake.

Appellants' contention as posed in question six, that the Trust Company, upon crediting Mrs. Staten's note with accrued interest of $3,517.16, added that amount to the indebtedness of Fahey at the time of the compromise settlement through a mistake of fact, is likewise without tangible evidence to support it. Appellants, in their argument in support of this contention, assume that the basis of the compromise settlement and the intention of the parties in executing it was merely to discharge Mrs. Staten's obligation for accrued interest on her original $15,000 note. The evidence in nowise justifies this assumption but, on the contrary, makes it apparent that the basis of that settlement and the purpose the parties had in mind was a deduction from Fahey's total indebtedness of the $12,500 item together with interest thereon from the date of the original loan to the date of the compromise settlement. That this was done is apparent from the evidence as is revealed by the statement we have made above with reference to this transaction. A degree of plausibility attends appellants' argument by reason of the fact that as a result of the compromise settlement Mrs. Staten's note was reduced by the amount of the accrued interest and that the amount of this accrued interest is in the neighborhood of the interest deduction actually made from Fahey's indebtedness. However, in attempting to establish that a mistake was made in the execution of the compromise settlement it was incumbent on appellants to establish by a clear, convincing and satisfactory proof that such a mistake was made. Morris v. Gilliam, 213 Ky. 763, 281 S. W. 1026. This they failed to do. On the contrary, the evidence abundantly sustains the chancellor's finding that no mistake was made.

Questions seven, eight and nine may be considered and disposed of together. Assuming that appellants are correct in their contentions that the Trust Company did not acquire a fee simple title to the Chicago property and that it sold that property in violation of Mrs. Staten's rights under the Illinois law, Mrs. Staten's only claim is, of course, one for damages against the Trust Company, to be measured by the difference between the fair market value of the property at the time the Trust Company disposed of it and the amount actually received for the

property, $10,500, which was credited on Mrs. Staten's indebtedness. In short, if the price received by the Trust Company for the property was its fair market value Mrs. Staten has no just complaint on this score. The chancellor found that the price obtained for the property was a fair and reasonable one and we think the evidence justified his finding. Without going into detail as to this evidence, it is sufficient to say that four Chicago real estate men and one merchant testified that $10,500 was a fair value for the property, while three real estate agents, witnesses for appellants, testified that it was worth from fourteen to seventeen thousand dollars. Even were we in doubt as to the correctness of the finding of the chancellor on this issue it would be our duty to affirm that finding. We are not even left in doubt since it appears to us that the evidence preponderates in favor of his finding.

The tenth and final question deals with excess interest claimed by Fahey to have been charged on his notes. Any claim for excess interest prior to the compromise settlement agreement of September 12, 1934, is, as a matter of course, barred by the terms of that agreement since it definitely fixed the amount of the Fahey indebtedness and necessarily eliminated all questions which might otherwise have been a subject of controversy because of what transpired prior to the agreement. However, the claim is apparently made that approximately $200 in excess interest was charged to Fahey on his notes since the date of the compromise settlement. As to this question, we may only say that it has not been satisfactorily demonstrated that usurious interest was actually charged. The brief for appellants merely refers us to a statement of these notes filed as an exhibit and seeks to have us to determine from that exhibit that usurious interest was charged. The claim is that in some instances advance interest was charged on renewal notes and added to the principal and because thereof the Trust Company gave Fahey a rebate of interest when he made payments but, it is claimed, in many instances no rebates were allowed. The only definite evidence we find in the record on this point is the testimony of Porter for the Trust Company that in taking renewal notes from Fahey the interest from the date of the note to maturity was not added to the principal or face of the note. In view of this evidence and by reason of the fact that appellants

have not satisfactorily demonstrated that the judgment embraces usurious interest, we are compelled to deny this contention. All other questions have been determined adversely to appellants.

Judgment affirmed.